KAPLAN FOX & KILSHEIMER LLP
Laurence D. King (SBN 206423)
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:  415-772-4707
lking@kaplanfox.com

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Frederic S. Fox
Jeffrey P. Campisi
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
rkaplan@kaplanfox.com
ffox@kaplanfox.com
jcampisi@kaplanfox.com

KAPLAN FOX & KILSHEIMER LLP
Justin B. Farar  (SBN 211556)
1801 Century Park East
Los Angeles, CA 90067
Telephone:  310-785-0800
Facsimile:  310-785-0897
jfarar@kaplanfox.com

*Lead Counsel for Lead Plaintiff the Los Angeles
City Employees' Retirement System*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SEQUENOM, INC. SECURITIES LITIGATION<br><br>This Document Relates To: ALL ACTIONS | Master File No:  3:09-cv-00921-LAB-WMC<br><br>**THE LOS ANGELES CITY EMPLOYEES' RETIREMENT SYSTEMS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF IT'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT** |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ..................................................................................................... 1

II. BACKGROUND, HISTORY OF NEGOTIATIONS AND
TERMS OF SETTLEMENT ................................................................................... 2

  A.  Background ............................................................................................... 2

  B.  Mediation.................................................................................................. 3

  C.  Terms of Settlement ................................................................................. 4

  D.  Sequenom's Financial Condition ............................................................. 4

  E.  Confirmatory Discovery ........................................................................... 5

III. ARGUMENT .......................................................................................................... 6

  A.  This Court Should Grant Preliminary Approval of the Proposed Settlement ............. 6

    1.  Factors to Be Considered by the Court in the Preliminary Approval
        of a Class Action Settlement ...................................................... 6

      a.  The Settlement Was Vigorously Negotiated and Is Supported
          by Experienced Counsel ..................................................... 8

      b.  The Substantial Benefit Obtained for the Class, Especially
          in Light of Serious Risks of Lesser or no Recovery, Supports
          Approval of the Settlement ................................................. 9

      c.  The Stage of the Proceedings and Discovery Completed
          Support Approval of the Settlement .................................... 9

    2.  Proposed Notice to the Class Is Adequate ..................................... 10

  B.  The Proposed Class Meets the Prerequisites for Class Certification Under
      Rule 23(a) .............................................................................................. 11

    1.  Numerosity ..................................................................................... 12

    2.  Commonality ................................................................................... 13

    3.  Typicality........................................................................................ 13

    4.  Adequacy......................................................................................... 14

    5.  Common Questions of Law Predominate and a Class Action Is the
        Superior Method of Adjudication.............................................. 15

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

IV.    SCHEDULE OF SETTLEMENT EVENTS ........................................................16

V.    CONCLUSION ........................................................................................................16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

1

## TABLE OF AUTHORITIES

2

PAGE

3

**Cases**

4

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975)....................................................12, 13, 15

5

*Boyd v. Bechtel Corp.,*
    485 F. Supp. 610 (N.D. Cal. 1979) ........................................................8

6

7

*Class Plaintiffs v. Seattle,*
    955 F.2d 1268 (9th Cir. 1992)...........................................................6, 7

8

*Eisenberg v. Gagnon,*
    766 F.2d 770 (3d Cir. 1985)...............................................................16

9

10

*Ellis v. Naval Air Rework Facility,*
    87 F.R.D. 15 (N.D. Cal. 1980), *aff'd,* 661 F.2d 939 (9th Cir. 1981) ....................8

11

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998)...............................................6, 11, 13, 14

12

13

*Harris v. Palm Springs Alpine Estates, Inc.,*
    329 F.2d 909 (9th Cir. 1964)...............................................................12

14

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.,*
    MDL No. 901, 1992 WL 226321 (C.D. Cal. June 10, 1992) ..............................8

15

16

*In re Immune Response Sec. Litig.,*
    497 F. Supp. 2d 1166 (S.D. Cal. 2007) ..................................................10

17

*In re Intelcom Group Sec. Litig.,*
    169 F.R.D. 142 (D. Colo. 1996)......................................................14, 15

18

19

*In re Inter-Op Hip Prosthesis Liab. Litig.,*
    204 F.R.D. 359 (N.D. Ohio 2001).........................................................15

20

*In re Micron Tech., Inc. Sec. Litig.,*
    247 F.R.D. 627 (D. Idaho 2007) ..........................................................14

21

22

*In re Portal Software, Inc. Sec. Litig.,*
    03-cv-5138, 2007 WL 1991529 (N.D. Cal. June 30, 2007) ..............................11

23

24

*In re Veritas Software Corp. Sec. Litig.,*
    496 F.3d 962 (9th Cir. 2007)...............................................................10

25

*In re Wireless Facilities, Inc. Sec. Litig.,*
    253 F.R.D. 630 (S.D. Cal. 2008)......................................................10, 13

26

27

*Kirkorian v. Borelli,*
    695 F. Supp. 446 (N.D. Cal. 1988) ........................................................8

28

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

*Lerwill v. Inflight Motion Pictures, Inc.,*
   582 F.2d 507 (9th Cir. 1978) ................................................................................14

*Mendoza v. Tucson School Dist. No. 1,*
   623 F.2d 1338 (9th Cir. 1980) ..............................................................................10

*Officers for Justice v. Civil Serv. Comm'n,*
   688 F.2d 615 (9th Cir. 1982) ..............................................................................6, 7

*Perez-Funez v. Dist. Dir., Immigration & Naturalization Serv.,*
   611 F. Supp. 990 (C.D. Cal. 1984) .......................................................................12

*Rodriguez v. West Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009) ................................................................................10

*Santos v. Camacho,*
   04-cv-0006, 2007 U.S. Dist. LEXIS 1668 (D. Guam Jan. 9, 2007) .......................11

*Schwartz v. Harp,*
   108 F.R.D. 279 (C.D. Cal. 1985) ..........................................................................12

*Torrisi v. Tucson Elec. Power Co.,*
   8 F.3d 1370 (9th Cir. 1993) ................................................................................6, 7

*Utility Reform Project v. Bonneville Power Admin.,*
   869 F.2d 437 (9th Cir. 1989) ..................................................................................6

*Van Bronkhorst v. Safeco Corp.,*
   529 F.2d 943 (9th Cir. 1976) ..................................................................................6

*Wehner v. Syntex Corp.,*
   117 F.R.D. 641 (N.D. Cal. 1987) ..........................................................................13

**Statutes**

15 U.S.C. §78u-4(a)(7) ..............................................................................................10

**Rules**

Fed. R. Civ. P.
   Rule 23 ................................................................................................................11

   Rule 23(c)(2)(B) ..................................................................................................10

**Other Authorities**

1 Herbert B. Newberg, *Newberg on Class Actions* (2d ed. 1985) ..............................14

Manual for Complex Litigation (4th ed. 2004) ..........................................................11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

1    Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff, the Los

2    Angeles City Employees' Retirement System ("LACERS" or "Lead Plaintiff"), respectfully submits

3    this Memorandum of Points and Authorities in support of LACERS' unopposed motion for

4    preliminary approval of the Settlement.  Specifically, LACERS moves this Court for entry of the

5    [Proposed] Order Preliminarily Approving Settlement ("Preliminary Approval Order"), submitted

6    herewith.  The proposed Preliminary Approval Order will, among other things: (i) grant preliminary

7    approval of the proposed class action settlement on the terms set forth in the Stipulation of

8    Settlement dated as of December 24, 2009 (the "Stipulation" or "Settlement"[1]); (ii) certify the

9    Settlement Class for settlement purposes only; (iii) approve the form and manner of giving notice of

10   the proposed Settlement to the Settlement Class (the "Notice"); (iv) approve of Rust Consulting,

11   Inc. to administer the claims; and (v) set a date for the Final Settlement Approval Hearing.  The

12   Settlement, if finally approved by the Court, would resolve this litigation against all defendants.

## I.    INTRODUCTION

    The proposed Settlement consists of (i) $14,000,000 in cash plus interest, (ii) shares of

Sequenom Common Stock ("Settlement Shares") amounting to, with certain exceptions, 9.95% of

the Company's shares after issuance of the Settlement Shares, and (iii) Sequenom's agreement to

adopt, or continue its implementation of certain changes, revisions, modifications and additions to

the corporate governance policies, protocols and practices.  If the Settlement Shares were issued

today, Sequenom would be required to issue 6,808,303 shares having a current value of

approximately $31 million.[2]   Therefore, at the present time the Settlement has a value of

approximately $45 million (the "Settlement Fund"), for the benefit of the Settlement Class,[3] in

exchange for the dismissal and release of the claims against Defendants Sequenom, Inc.

("Sequenom" or the "Company"), Harry Stylli, Paul Hawran, Allan T. Bombard, Charles R. Cantor,

---

[1]    All capitalized terms that are not defined herein are defined in the Stipulation which is submitted herewith.

[2]    As of January 20, 2010, Sequenom stock closed at $4.55 per share.

[3]    The "Settlement Class" is defined as all persons or entities who, during the Settlement Class Period (June 4, 2008 through April 29, 2009) purchased publicly traded shares of Sequenom Common Stock.  As further described below, certain persons are excluded from the Settlement Class.

1

Steven Owings, Harry F. Hixson, Jr. and Elizabeth Dragon (collectively, the "Defendants"). Both LACERS' board and Sequenom's board have approved the Settlement.

## II.    BACKGROUND, HISTORY OF NEGOTIATIONS AND TERMS OF SETTLEMENT

This is a securities class action alleging false and misleading statements and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, and control person liability under Section 20(a) of the Exchange Act.

### A.    Background

Sequenom purported to be researching, developing and pursuing the commercialization of various non-invasive molecular diagnostic tests for prenatal genetic disorders and diseases. Further, Sequenom was purportedly developing and commercializing prenatal screening and diagnostic tests for Trisomy 21 ("T-21"), or Down syndrome, using its non-invasive, circulating cell-free fetal (ccff) nucleic acid based assay technology. According to Sequenom, the technology was non-invasive to the womb and used a maternal blood draw for prenatal diagnosis in order to provide more fundamental and reliable information about the fetus early in pregnancy. In press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009 the Company made representations about certain Research and Development ("R&D") test data and results that indicated that the test was nearly 100% accurate in identifying Down syndrome.

On April 29, 2009, after the close of trading, Sequenom disclosed that the expected June 2009 launch of its T-21 test would be delayed and that the Company's prior positive statements about the data and tests, including statements that the test was nearly 100% accurate in identifying Down syndrome, were no longer reliable. Further, the Company stated that employee mishandling of R&D test data and results raised a significant concern regarding the integrity of that data, that four employees had been suspended and that the Company's board of directors had formed a special committee of independent directors to oversee an investigation of the employees' activity related to the test data and results for the Down syndrome product. Also on April 29, 2009, the Company indicated that investors should no longer rely upon the T-21 R&D test data and results and all previous announcements about such data and test.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

On April 30, 2009, the first trading day after the disclosure, Sequenom's common stock price declined by approximately 76% from $14.91 per share at the close of trading on April 29, 2009, to close at $3.62 per share on heavier than usual volume.

Beginning on or about April 30, 2009, plaintiffs filed class actions against Defendants in this Court. The complaints alleged, among other things, that defendants made false statements and omissions concerning the purported development of a prenatal noninvasive blood test for Down syndrome.

By Order dated September 1, 2009, this Court consolidated the actions then before it and all related actions subsequently filed and appointed LACERS Lead Plaintiff and Kaplan Fox & Kilsheimer LLP as Lead Counsel ("Kaplan Fox" or "Lead Counsel"). [Docket No. 74].

On September 28, 2009, Sequenom announced that it had dismissed a number of executives including defendants Harry Stylli ("Stylli"), the CEO and defendant Elizabeth Dragon and admitted that the data for the Down syndrome test had been mishandled.

**B.     Mediation**

Lead Plaintiff was preparing to file a consolidated complaint when the Defendants requested that the parties engage in mediation. Because of Sequenom's reported financial condition and its need for financing, Lead Plaintiff agreed to enter mediation. The Settlement was reached only after extensive negotiations overseen by the mediator, the Honorable Daniel Weinstein of JAMS, a retired California Superior Court judge with extensive experience in mediating securities class actions. On December 1, 2009, Judge Weinstein conducted a full day mediation session. For LACERS the mediation session was attended by Lead Counsel and a representative of LACERS. While the session on December 1, 2009 did not produce an agreement, substantial progress was made. The settlement discussions continued during the following weeks with many telephonic conferences among counsel and top executives of Sequenom. After significant additional negotiation, an agreement in principle was reached on or about December 24, 2009. In connection with the mediation, Lead Plaintiff utilized the services of an investment banking consultant, a corporate governance consultant and a damage and causation consultant.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

### C.      Terms of Settlement

The cash component of the Settlement is $14 million, all of which is to be paid by Sequenom's insurance carriers. The available insurance of $20 million, in four layers under four different policies, is the only real viable source of cash and is a wasting asset.  There are five law firms representing five different defendant groups which are being paid from the insurance. Moreover, there are continuing derivative actions against present and former Sequenom officers and directors in state and federal court and a continuing SEC investigation, the defense costs for which are being paid from the $20 million of insurance.

The stock component of the Settlement is 9.95% of the Company's shares after the issuance of the settlement shares.  The negotiations over the stock component were complex.  As set forth above, Lead Plaintiff retained an investment banker who participated in numerous telephone conferences with Sequenom, its top officers and its investment banker.  Although the value of the stock is likely to fluctuate, the Settlement Class receives all of the upside potential from the stock.

The corporate governance component of the Settlement consists of several improvements in corporate governance, many of which are designed to prevent the improper conduct at issue in this action.  As set forth above, Lead Plaintiff retained a corporate governance consultant who assisted Lead Counsel and Lead Plaintiff in formulating corporate governance demands, many of which have been adopted as part of the Settlement.  The corporate governance provisions[4] include specific requirements for board Nominating and Corporate Governance committees, the promulgation of a new corporate disclosure policy, and specific policies to prevent a reoccurrence of what caused the problems at Sequenom, including data storage at independent third parties and the hiring of a full time biostatitiscian.

### D.      Reasons for the Settlement

If this litigation were to continue, it is likely that the Settlement Class would recover less or nothing at all.  In the nine months ended September 30, 2009, Sequenom reported a net loss of $52.6 million, a substantially increased loss compared to the same nine months of 2008.  Sequenom

---

[4]      The full list of corporate governance provisions are listed in Annex A to the proposed *Notice of Pendency and Proposed Settlement of Class Action which* is attached as Exhibit A-1 to the Proposed Preliminary Approval Order that has been submitted herewith.

4

is burning cash from operations at a substantial rate, about $50 million in the nine month period ended September 30, 2009. Sequenom's reported $50 million in cash and cash equivalents as of September 30, 2009 will quickly be burned in operations. Therefore, although the Company has remaining cash, it is being used in operations and is necessary for the Company is to survive.

However, even with its existing cash, the Company needs more financing and settlement of this action is necessary for it to obtain that financing. If the litigation were to continue, there would be less cash from insurance available because it will have been used in defense costs and less cash for settlement. Lead Plaintiff has reason to believe that this is the maximum cash that can be obtained from the insurance proceeds. Likewise, Lead Plaintiff believes that attempting to obtain stock in excess of 9.95% of the outstanding shares may have a negative affect on the Company's ability to raise capital, without which it cannot survive. Therefore, Lead Plaintiff believes the stock component of the Settlement represents the maximum amount of stock which could be obtained without threatening the long term viability of the Company. Further, the Settlement's corporate governance changes will help ensure that the events which led to this litigation do not occur again and are, in general, good corporate governance policies.

The Settlement creates substantial value with the potential for more value if the stock price increases further, while at the same time giving the Company, with a product with important societal values, a chance to survive. As noted above, if the litigation continues, there are significant questions whether the Company would be able to satisfy a judgment in an amount in excess of the settlement value. The mediator, retired Judge Weinstein, recommends and endorses the Settlement.

**E.    Confirmatory Discovery**

Defendants continue to deny liability for violations of the federal securities laws, including the allegations that the defendants acted with scienter, *i.e.,* knowingly or recklessly, there was *de minimus* selling of stock by the individual defendants during the class period and defendant Stylli purchased stock. As such, Lead Counsel required that as a condition of settlement, Sequenom agree to provide confirmatory discovery. Sequenom has produced approximately 215,000 pages of documents to Lead Counsel, which are the materials produced by Sequenom to the SEC. To date, Lead Counsel has reviewed approximately 100,000 pages and will complete the review prior to the Final Settlement Approval Hearing. Further, on January 8, 2010, pursuant to the Settlement,

5

Sequenom's counsel made a proffer to Lead Counsel concerning the status of the various civil and criminal investigations and the implementation of the corporate governance reforms.

Given the substantial risks of continued litigation and Sequenom's financial condition, Lead Plaintiff believes that the Settlement is fair, reasonable and adequate. Accordingly, LACERS respectfully moves for preliminary approval of the Settlement.

## III.   ARGUMENT

### A.   This Court Should Grant Preliminary Approval of the Proposed Settlement

#### 1.   Factors to Be Considered by the Court in the Preliminary Approval of a Class Action Settlement

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise of claims brought on a class basis. Whether to approve a proposed settlement is within the sound discretion of the district court, which should be exercised in the context of strong judicial policy that favors settlements. *See Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "[T]here is an overriding public interest in settling and quieting litigation," and this is particularly true in class action suits." *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *see also Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Ninth Circuit has held that "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625; *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (citing *Officers for Justice*, 688 F.2d at 625).

In considering whether to grant preliminary approval of a class action settlement, courts make a preliminary evaluation of the fairness of the settlement prior to issuing notice to the class and prior to holding a final approval hearing. The general standard by which courts are guided when deciding whether to grant preliminary approval of a class action settlement is whether the

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

proposed settlement falls within the range of what could be found "fair, adequate and reasonable," so that notice may be given to the proposed class and a hearing for final approval can be scheduled. *Class Plaintiffs*, 955 F.2d at 1291; *Officers for Justice*, 688 F.2d at 625.

At this point, the Court need not answer the ultimate question: whether the Settlement *is* fair, reasonable and adequate. When the Court makes this ultimate determination at a later point, the Court will be asked to review the following factors: the strength of Lead Plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; and the experience and views of counsel. *Torrisi*, 8 F.3d at 1375 (citing *Officers for Justice*, 688 F.2d at 625).

LACERS requests only that the Court take the first step in the settlement approval process and grant preliminary approval of the proposed Settlement. As discussed above, the proposed Settlement is unquestionably beneficial to the Settlement Class. Given the complexities of this litigation and the continued risks if the litigation were to proceed, the Settlement represents a reasonable resolution and eliminates the risk that the Settlement Class might recover less or nothing at all.

As outlined in the proposed Preliminary Approval Order, if the Court grants preliminary approval, Lead Plaintiff, through the Settlement Administrator, will notify Settlement Class Members of the Settlement by mailing the Notice and Proof of Claim to Settlement Class Members. The Notice advises Settlement Class Members of the essential terms of the Settlement, information regarding Lead Counsel's fee and expense application and the proposed plan for allocating the Settlement proceeds among Settlement Class Members. The Notice also sets forth the procedure for objecting to the Settlement, Plan of Allocation or the request for an award of attorneys' fees and reimbursement of litigation expenses, sets out the procedure for opting out of the Settlement Class and provides specifics on the date, time and place of the Final Settlement Approval Hearing. The proposed Preliminary Approval Order further requires Lead Plaintiff to cause the Summary Notice to be published once in the national edition of the *Wall Street Journal*. Lead Plaintiff believes that, because the Notice and Summary Notice fairly apprise Settlement Class Members of their rights

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

with respect to the Settlement, they represent the best notice practicable under the circumstances and should be approved by the Court.

Lead Plaintiff, subject to Court approval, has selected Rust Consulting, Inc. ("Rust") to serve as Settlement Administrator. A description of Rust, including its experience in administering securities class actions, is attached as Exhibit 1.

As summarized below, and as will be detailed further in a subsequent motion for final approval of the Settlement, a preview of the factors considered by courts in granting final approval of class action settlements demonstrates that this Settlement is well within the range of possible approval.

### a.   The Settlement Was Vigorously Negotiated and Is Supported by Experienced Counsel

Courts recognize that the opinion of experienced counsel supporting the settlement after vigorous arm's-length negotiations is entitled to considerable weight.[5] Here, Lead Counsel conducted an extensive investigation into the claims asserted in the complaints including, but not limited to, multiple interviews with confidential witnesses and consultation with experts in damages, loss causation, financial analysis and corporate governance. Thus, Lead Counsel has a solid understanding of the strengths and weaknesses of the claims, both factually and legally, and was able to engage in a rigorous negotiation process with Defendants.

Additionally, throughout the litigation and settlement negotiations, Defendants have been represented by experienced counsel from prominent law firms. Counsel for Defendants were equally well-informed regarding the case, and their representation of Defendants was no less rigorous than Lead Counsel's representation of the Lead Plaintiff and the Settlement Class.

As a result, the parties' settlement negotiations were hard-fought. The negotiations required not only a formal full-day mediation session, conducted under the direction of the Honorable Daniel

---

[5]   *See, e.g., Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight"), *aff'd*, 661 F.2d 939 (9th Cir. 1981); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979); *see also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, MDL No. 901, 1992 WL 226321, at *2 (C.D. Cal. June 10, 1992) (finding belief of counsel that the proposed settlement represented the most beneficial result for the class to be a compelling factor in approving settlement); *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL                    09cv00921
OF PROPOSED CLASS ACTION SETTLEMENT

Weinstein (Ret.), but also several weeks of further negotiations.  With this background, there is no doubt that the Settlement was reached without collusion and after good-faith bargaining among the parties, and this factor supports a finding that the Settlement is fair, adequate and reasonable for purposes of preliminary approval.

### b.   The Substantial Benefit Obtained for the Class, Especially in Light of Serious Risks of Lesser or no Recovery, Supports Approval of the Settlement

As set forth above, the Settlement provides for the recovery of $14 million in cash plus interest and the Settlement Shares to be allocated among Settlement Class Members after deduction for Court-approved fees and expenses, as well as the corporate governance reforms.  If the litigation had continued, Lead Plaintiff faced substantial risks, including establishing Defendants' liability and the full amount of the Settlement Class' damages at summary judgment or trial.  In addition, litigating this complex securities fraud class action to completion would result in significant expense and delay.  This recovery, obtained in the face of the risk of a lesser recovery or no recovery, supports approval of the Settlement.

### c.   The Stage of the Proceedings and Discovery Completed Support Approval of the Settlement

The stage of proceedings is an additional factor supporting the Settlement.  Here, Lead Counsel was preparing an amended complaint when Defendants requested a mediation.  In addition, Lead Counsel conducted a thorough investigation of the facts and claims of this case, including review and analysis of the Company's SEC filings, annual reports and other public statements and interviews with confidential witnesses.  Further, as part of the Stipulation, Sequenom agreed to certain confirmatory discovery, which Lead Counsel has been reviewing, as well as proffers concerning the status of the various civil and criminal investigations and the institution of the corporate governance reforms.

Based on these facts, there can be no question that Lead Counsel has an understanding of the strengths and weaknesses of the claims.

9

## 2.      Proposed Notice to the Class Is Adequate

Notice of a proposed settlement must be given to class members in the most practicable manner under the circumstances, describing "the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Mendoza v. Tucson School Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980); *see also* Fed. R. Civ. P. 23(c)(2)(B). In addition, pursuant to the PSLRA, "every settlement notice must include a statement explaining a plaintiff's recovery." *In re Wireless Facilities, Inc. Sec. Litig.*, 253 F.R.D. 630, 636 (S.D. Cal. 2008) (citing *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 969 (9th Cir. 2007)).

The proposed Notice to the Settlement Class in this action more than satisfies this standard. The proposed Notice informs the Settlement Class of: (1) the amount of the Settlement (¶1); (2) the reasons why the parties propose the Settlement (¶2); (3) the estimated average recovery per share (¶3); (4) the attorneys' fees and expenses sought (¶4); (5) the name, telephone number and address of representatives of Lead Counsel, who will be reasonably available to answer questions from Settlement Class Members concerning matters contained in the Notice (¶5); (6) the right of Settlement Class Members to object to the Settlement or seek exclusion from the Settlement Class (*Id.*); and (7) the dates and deadlines for certain settlement-related events (¶¶ 10, 12, 39, 42, 49, 53, 59, 60, 67). 15 U.S.C. §78u-4(a)(7).

Here, the proposed Notice is adequate and complies with due process, Rule 23 and the PSLRA.[6] If the Court grants preliminary approval of the Settlement, the Notice will be mailed to all Settlement Class Members who appear on the transfer records of Sequenom as having transferred to their names Sequenom common stock during the time period from June 4, 2008 through April 29, 2009, inclusive (the "Settlement Class Period"). Further, the Notice will be published once in the Legal Notices section of the national edition of the *Wall Street Journal*.

---

[6]     *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard'" (citations omitted)); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1170 (S.D. Cal. 2007) (notice providing description of the nature of the action and issues involved in the litigation, concise and clear statement of definition of the class that was certified, procedure for requesting appearance at the settlement hearing, procedure for exclusion from the class, binding effect of the class judgment and deadline for filing objections approved).

10

Further, Lead Counsel, through the Settlement Administrator, will use reasonable efforts to give notice to nominee holders such as brokerage firms and other persons or entities who purchased Sequenom common stock during the Settlement Class Period as record owners but not as beneficial owners.

Courts routinely find that comparable notice procedures meet the requirements of due process, Rule 23 and the PSLRA.[7]

**B.    The Proposed Class Meets the Prerequisites for Class Certification Under Rule 23(a)**

The parties have stipulated that the Court may, for settlement purposes, certify a Settlement Class and appoint Lead Plaintiff as the Class Representative.

The Ninth Circuit has long recognized that class actions may be certified for the purpose of settlement only. *Hanlon*, 150 F.3d at 1019. Classes for the purpose of settlement are recognized under the general scheme of Rule 23, provided that the class is eventually determined to meet the certification requirements under Rule 23. *Id.*  Rule 23(a) sets forth four prerequisites to class certification: (1) numerosity; (2) commonality; (3) typicality and (4) adequacy of representation. In addition, the class must meet one of the three requirements in Rule 23(b). Fed. R. Civ. P. 23; *see also* Manual for Complex Litigation §21.633 (4th ed. 2004).

Here, the proposed Settlement Class is defined in the Stipulation as follows:

> all persons or entities who, during the Settlement Class Period, purchased publicly traded shares of Sequenom Common Stock. Excluded from the definition of "Settlement Class" and "Settlement Class Members" are (a) Defendants; any parent or subsidiary, present or former director, officer, or subsidiary of Sequenom; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns, any immediate family member of a Settling Individual Defendant and (b) any putative members of the

---

[7]     *See In re Portal Software, Inc. Sec. Litig.*, 03-cv-5138, 2007 WL 1991529, at *7 (N.D. Cal. June 30, 2007) (dissemination of notice to all reasonably identifiable class members with summary notice published approved as best practical (citing Manual for Complex Litigation §21.311 (4th ed. 2004) ("Publication in magazines, newspapers, or trade journals may be necessary if class members are not identifiable after reasonable effort"))); *Santos v. Camacho*, 04-cv-0006, 2007 U.S. Dist. LEXIS 1668, at *24-*25 (D. Guam Jan. 9, 2007) (notice approved where each class member would be mailed a notice and notice would also be published, and where the proposed notice adequately described the facts of the case, the members of the class, the settlement terms, information regarding attorney fees, information on how class members could object to the settlement and contact information for class counsel and defense counsel).

11

Settlement Class who timely and validly exclude themselves from the Settlement Class in accordance with the requirements set forth in the Mailed Notice and Rule 23 of the Federal Rules of Civil Procedure.

Generally, courts have found securities claims to be particularly well-suited for class action status because they allow for enforcement of the policies behind the securities laws in circumstances where there are numerous investors with small individual claims that otherwise could effectively be barred from litigation. *See Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975). This action is no exception, and as explained below, the parties agree that, for the purpose of the Settlement, the Settlement Class should be certified as satisfying each of the requirements set forth above.

### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. The Ninth Circuit has stated that "'impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (citation omitted). Indeed, courts have held that classes consisting of 25 members were large enough to justify certification.[8] Additionally, the exact size of the class need not be known so long as general knowledge and common sense indicate that the class is large.[9]

Here, millions of shares of Sequenom common stock were traded on NASDAQ during the Settlement Class Period. In addition, beneficial holders of Sequenom common stock are believed to number, at a minimum, in the thousands and are geographically located throughout the United States, making joinder of all Settlement Class Members impracticable. Thus, the numerosity element is satisfied.

---

[8]   *See Perez-Funez v. Dist. Dir., Immigration & Naturalization Serv.*, 611 F. Supp. 990, 995 (C.D. Cal. 1984) .

[9]   *See Schwartz v. Harp*, 108 F.R.D. 279, 281-82 (C.D. Cal. 1985) ("A failure to state the exact number in the proposed class does not defeat class certification, and plaintiff's allegations plainly suffice to meet the numerosity requirement of Rule 23." (citations omitted)).

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

### 2.       Commonality

Rule 23(a)(2) is satisfied where the claims of the proposed class representatives share at least one question of fact or law in common with the claims of the prospective class. *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D. Cal. 1987). Further, there may be varying fact situations among individual members of the class so long as the claims of the plaintiffs and other class members are based on the same legal or remedial theory. *Blackie*, 524 F.2d at 902. Here, questions which are common to the proposed Class include, among others:

(i)    whether the federal securities laws were violated by Defendants' alleged acts;

(ii)   whether publicly disseminated press releases and other statements during the Settlement Class Period misrepresented and/or omitted material facts;

(iii)  whether the market price of Sequenom common stock during the Settlement Class Period was artificially inflated due to the material misrepresentations and/or nondisclosures alleged; and

(iv)   whether members of the Settlement Class have sustained damages and, if so, the appropriate measure of damages.

Courts routinely hold that securities actions containing common questions such as the ones listed above are especially appropriate for class certification. In short, because the core complaint of all Settlement Class Members is that they purchased Sequenom common stock at artificially inflated prices and suffered damages as a result of the alleged securities violations, the commonality requirement of Rule 23(a)(2) is satisfied. *See In re Wireless*, 253 F.R.D. at 635 (finding "core issue" in a securities litigation to be plaintiffs' "acquisition of [defendant's] common stock at artificially inflated prices").

### 3.       Typicality

The typicality requirement of Rule 23(a)(3) requires only that the class representatives assert claims that are typical of the class. Differences in the amount of damage, the size or manner of purchase, the nature of the purchaser and the date of purchase are insufficient to defeat class certification. In other words, typicality does not require that all class members be identically situated. Rather, "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

Here, Lead Plaintiff's claims and the claims of members of the Settlement Class arise from the same alleged conduct by Defendants. Lead Plaintiff alleges that, like the other members of the Settlement Class, it purchased Sequenom common stock at prices that were inflated because Defendants, in violation of the federal securities laws, issued false and materially misleading statements and/or omissions during the Class Period.

Further, the proof that Lead Plaintiff would present to establish its claims would also prove the claims of the rest of the Settlement Class.[10] Additionally, Lead Plaintiff is not subject to any unique defenses that could make them atypical members of the Settlement Class. In short, Lead Plaintiff's claims are typical of the claims of the Settlement Class, satisfying Rule 23(a)(3).

### 4. Adequacy

A representative party satisfies Rule 23(a)(4)'s adequacy requirement by showing that it will fairly and adequately protect the interests of the class. Proposed class representatives satisfy this requirement when they are free of interests that are antagonistic to other members of the class and where counsel representing the class are qualified, experienced and capable of conducting the litigation. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) (citation omitted); *Hanlon*, 150 F.3d at 1020.

Here, as described above, LACERS' claims are typical of, and coextensive with, those of the Settlement Class. LACERS, like all Settlement Class Members, alleges that it purchased Sequenom common stock at artificially inflated prices during the Class Period as a result of Defendants' alleged materially false and misleading statements and/or omissions, and were damaged thereby. Further, LACERS retained Kaplan Fox, which has vast experience in litigating securities class actions and who has successfully prosecuted many securities and other complex class actions throughout the United States. Thus, LACERS is an adequate representative of the

---

[10]   *See, e.g., In re Micron Tech., Inc. Sec. Litig.*, 247 F.R.D. 627, 632 (D. Idaho 2007) (finding typicality in securities class action because lead plaintiffs "have the same claims as all class members; all of them claim to be the victims of artificially high Micron stock prices"); *In re Intelcom Group Sec. Litig.*, 169 F.R.D. 142, 149 (D. Colo. 1996) (finding typicality in securities class action where major issue presented was "whether the Defendants have violated the federal securities laws").

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

Settlement Class, and its counsel is qualified, experienced and capable of prosecuting this action. This satisfies Rule 23(a)(4).

### 5. Common Questions of Law Predominate and a Class Action Is the Superior Method of Adjudication

Finally, in addition to the four requirements of Rule 23(a), a class must also satisfy one of the three subparts of Rule 23(b). Here, without question a class action is superior to other available methods, as required by Rule 23(b)(3). To ensure that the class action is more efficient than individual actions, Rule 23(b) requires that common issues predominate over issues that are particular to a class representative. Generally, common questions will predominate if the common issue constitutes a significant part of each of the class members' individual cases. "[C]ommon issues need only predominate, not outnumber individual issues." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 374-75 (N.D. Ohio 2001). Courts routinely determine that common questions predominate when a complaint alleges a "common course of conduct" of misrepresentations, omissions and other wrongdoing that affects all class members in the same manner. *See, e.g., Blackie*, 524 F.2d at 905-08. In short, "the superiority of class actions in large securities fraud is well recognized." *Intelcom*, 169 F.R.D. at 49.

The predominance test is met in this case, and a class action is superior to other available methods. The same set of operative facts and a single proximate cause applies to each Settlement Class Member – each Settlement Class Member purchased Sequenom common stock during the Settlement Class Period at prices alleged to be artificially inflated as a result of Defendants' false and misleading statements and/or omissions, and each Settlement Class Member was allegedly harmed when the undisclosed facts came to light. If LACERS and each of the Settlement Class Members were to bring individual actions, each would be required to prove the same wrongdoing by Defendants to establish liability.[11] In light of the foregoing, all of the requirements of Rule 23(a) and (b) are satisfied. Thus, there are no issues which would prevent the Court from certifying this Class for settlement purposes and appointing Lead Plaintiff as the class representative.

---

[11]   *See Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (class actions are a particularly appropriate and desirable means to resolve claims based on securities laws).

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT

09cv00921

## IV.   SCHEDULE OF SETTLEMENT EVENTS

LACERS proposes the schedule set forth below for the settlement-related events in this case.

| Event | Proposed Due Date |
|---|---|
| Deadline for mailing the Notice and Proof of Claim to Class Members[12] ("Notice Date") | 10 business days after entry of Preliminary Approval Order |
| Deadline for publishing Summary Notice[13] | 5 business days after Notice Date |
| Deadline for submitting exclusion requests | 45 calendar days after Notice Date |
| Deadline for filing papers in support of final approval of Settlement, Plan of Allocation and Lead Counsel's application for attorneys' fees and expenses | 30 calendar days prior to Final Approval Hearing |
| Date for filing any objections to the Settlement | 20 calendar days before the Final Approval Hearing |
| Final Approval Hearing | At least 75 calendar days after entry of preliminary approval order. |
| Deadline for submitting claim forms | 90 calendar days after the Notice Date |

## V.   CONCLUSION

Based on the foregoing, Lead Plaintiff respectfully moves this Court to enter the [Proposed] Preliminary Approval Order submitted herewith.

Dated:  January 21, 2010                      Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/ Laurence D. King
Laurence D. King (SBN 206423)
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:  415-772-4707
lking@kaplanfox.com

---

[12]   *See* [Proposed] Preliminary Approval Order, Exhibits A-1 and A-2.

[13]   *See id.*, Exhibit A-3.

16

1

2

3

4

5

6

                              Robert N. Kaplan
                              Frederic S. Fox
                              Jeffrey P. Campisi
                              KAPLAN FOX & KILSHEIMER LLP
                              850 Third Avenue
                              New York, NY 10022
                              Telephone:  212-687-1980
                              Facsimile:  212-687-7714
                              rkaplan@kaplanfox.com
                              ffox@kaplanfox.com
                              jcampisi@kaplanfox.com

7

8

9

10

                              Justin B. Farar  (SBN 211556)
                              1801 Century Park East
                              Los Angeles, CA 90067
                              Telephone:  310-785-0800
                              Facsimile:  310-785-0897
                              jfarar@kaplanfox.com

11

                              *Lead Counsel for Lead Plaintiff the Los Angeles*
                              *City Employees' Retirement System*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT                        09cv00921

# Exhibit 1



# Rust Consulting, Inc. Summary of Qualifications

Rust Consulting, Inc. ("Rust") is a national claims administration leader with 30 years experience that has performed over 2,500 cases.

With our securities operations located in Palm Beach Gardens, Fla., and Melville, N.Y., Rust is an administration firm specializing in securities, insurance, ERISA, consumer, antitrust and other types of class action settlements. The Rust team is made up of professionals with backgrounds in claims administration, law, imaging, quality assurance, insurance, financial and management information systems. Our experience, talent and technology allow us to provide powerful support and simple solutions for even the most complex settlements.

## EXPERIENCE

Among our relevant experience are:

- *In re AIG Securities Litigation - PricewaterhouseCoopers Settlement*
  More than 2.2 million Notice Packets; over 530,000 claims received.

- *In re Merrill Lynch & Co. Securities Litigation*
  More than 1 million Notice Packets mailed; over 200,000 claims received.

- *SEC Fannie Mae Settlement*
  More than 1.5 million Notice Packets mailed; more than 387,000 claims received.

- *In re: Waste Management, Inc. Securities Litigation*
  More than 400,000 Notices Packets mailed; processed more than 100,000 claims.

- *In re Motorola Securities Inc.*
  More than 1.7 million Notice Packets mailed; more than 209,000 claims processed.

- *In re Mercury Interactive Corp. Securities Litigation*
  More than 250,000 Notice Packets mailed; processed more than 27,000 claims.

- *In re Biovail Corporation Securities Litigation*
  More than 117,000 foreign and domestic Notice Packets mailed; more than 44,800 claims processed.

## TALENT

Our management team is supported by a seasoned and fully trained staff in our Florida, Minnesota, California and New York offices. Together, they are made up of professionals with backgrounds in claims administration, law, imaging, quality assurance, insurance, financial and management information systems. Our in-depth understanding of securities, derivatives, financial, insurance, consumer and antitrust actions has enabled Rust to successfully manage class action settlements. Experience summaries of our securities team are shown below.

Thomas R. Glenn, Executive Vice President, earned his Bachelor of Business Administration in Computer Information Systems from Idaho State University in 1983. Tom oversees the day-to-day operations of all of our settlements and works closely with Quality Assurance and I.T. to ensure accuracy and efficiency in each of our projects. With more than 15 years senior management experience in litigation support services and general I.T. knowledge, Tom brings a wide breadth of knowledge and experience to manage efficient and effective claims administration processes. Like everyone on our management team, Tom is hands-on and oversees the training and oversight of the Rust service providers.

Charlie Ferrara, Managing Senior Project Administrator, oversees all securities projects, has over 20 years experience in claims administration and settlement implementation for hundreds of settlements involving securities, SEC disgorgement, consumer antitrust, asbestos, and bankruptcy reorganizations, having served as the Vice President of Operations for a competitor firm before joining Rust in 2006. Charlie earned his Associate degree in Business Administration from Nassau Community College and oversees the day-to-day operations of the securities department for all securities settlements. He works closely with the Quality Assurance and I.T. departments to ensure accuracy and efficiency of data capture, implementation and maintenance of proprietary software applications, and outbound correspondence such as letters and distribution instruments. Charlie and his team are responsible for ensuring that each settlement is being administered according to the guidelines of the settlement agreement. He and his team provide value added oversight in each phase of the administration, from notice dissemination to calculation and distribution.

Peter Craig, Senior Project Administrator, earned his Juris Doctorate from the Massachusetts School of Law and his Bachelor of Science in Business Administration from Ramapo College of New Jersey. Peter has more than nine years experience in securities and corporate actions. Prior to joining Rust, Peter worked for several prestigious investment corporations and banks and has extensive experience in the securities industry. He currently manages several projects involving mutual funds, limited partnerships and securities settlements.

**Deborah McComb**, Director of New York Operations and Senior Project Administrator, studied business management and earned various certifications in computer hardware and Microsoft applications. In addition to managing several pharmaceutical antitrust settlements and ERISA litigations, she oversees the operations and the overall administration of our New York office. With 12 years of experience in claims administration, including 10 years of management experience at Rust, Deborah is a hands-on manager who is actively involved in all aspects of the claims administration process. She specializes in locating class members and the heir location process for settlements; she and her team have located hundreds of thousands of claimants/participants or their beneficiaries on various settlements.

**Charlene Young**, Senior Project Administrator, earned her Master of Business Administration and Bachelor of Business Administration from Florida Atlantic University. Prior to joining Rust, as the director of a private post-secondary school, Charlene successfully managed the operations of the main campus while adhering to strict federal, state, and accreditation standards. With over 10 years of managerial experience accompanied by a strong analytical background, she effectively and efficiently manages several securities settlements. As a project manager, Charlene works closely with brokers and nominees as well as internal departments to guarantee efficient claims processing and overall project management.

**Ken Wood**, Director of Bank & Tax , oversees all the banking and tax work for Rust. Ken brings experience working on distributions, tax identification set up, investment of escrow funds, positive pay, claimant award taxability, quarterly 1120-SF tax deposits and year -end reporting. He brings over 15 years of senior management leadership to our group including the last three years with Rust leading the bank and tax group. Having worked previously in senior management positions as President/CEO, Chief Financial Officer, Controller and Vice President of Finance, he brings years of financial and organizational leadership experience to Rust. He is active in managing over 500 1120-SF tax returns yearly and works closely with outside tax advisors on various issues. The bank and tax group directly or indirectly manage over $1 billion in various assets at various stages of distribution.

*Select Service Providers*
Rust is able to pass on significant savings to our clients and their respective settlement funds by aligning with select service providers who have dedicated resources and tools to assist us in the various administration phases of the settlements. We have established long-term relationships with these select service providers who provide professional services at minimal costs.

## TECHNOLOGY

### Integrated Settlement Information System (ISIS)

Rust's proprietary system, ISIS (Integrated Settlement Information System) is a relational database designed with user-friendly features that allow for (1) quick and accurate data entry, either manually or using barcode technology, (2) easy-to-use query menu options and (3) advanced reporting tools for standard and *ad hoc* customized reports. The system was developed with generic modules that can be quickly and easily customized to handle any settlement.

ISIS is supported by SQL Server, a client/server database engine that supports triggers, stored procedures and views (virtual tables). SQL Server is a robust relational database product that runs on a Windows Server Platform enhanced for large-scale online transactional processing. It also supports the Microsoft® Open Database Connectivity (ODBC) standard allowing integration with other front-end applications supporting ODBC. This makes reporting, whether routine or customized, that much easier, and allows hands-on data for review and manipulation by the end-user. Additionally, data is in real-time, not batched, and is easily queried.

### Imaging

ISIS is also configured to work with the Kofax Ascent Capture® imaging software, which is used in many of our cases as an efficient and cost-

# ATTACHMENT B

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE(MM/DD/YYYY)
12/23/2009

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | | |
|---|---|---|---|
| Aon Risk Services Northeast, Inc.<br>New York NY Office<br>199 Water Street<br>New York NY 10038-3551 USA | | | |
| PHONE-(866) 283-7122     FAX-(847) 953-5390 | INSURERS AFFORDING COVERAGE | | NAIC # |
| INSURED | INSURER A: Hartford Fire Insurance Co. | | 19682 |
| SOURCECORP, Incorporated<br>Rust Consulting, Inc.<br>625 Marquette Avenue Suite 880<br>Minneapolis MN 55402 USA | INSURER B: Illinois Union Insurance Company | | 27960 |
| | INSURER C: Travelers Indemnity Co of America | | 25666 |
| | INSURER D: ACE Property & Casualty Insurance Co. | | 20699 |
| | INSURER E: | | |

## COVERAGES

SIR applies per terms and conditions of the policy

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.                LIMITS SHOWN ARE AS REQUESTED

| INSR LTR | ADDL INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE(MM/DD/YYYY) | POLICY EXPIRATION DATE(MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>[X] COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE [X] OCCUR | 10UENTE1593 | 12/15/2009 | 12/15/2010 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300,000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>[ ] POLICY [ ] PRO-JECT [X] LOC | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | | **AUTOMOBILE LIABILITY**<br>[X] ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>HIRED AUTOS<br>NON OWNED AUTOS | 10 UEN TE1583 | 12/15/2009 | 12/15/2010 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | |
| | | | | | | BODILY INJURY (Per accident) | |
| | | | | | | PROPERTY DAMAGE (Per accident) | |
| | | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | |
| | | | | | | OTHER THAN EA ACC<br>AUTO ONLY: AGG | |
| D | | **EXCESS / UMBRELLA LIABILITY**<br>[X] OCCUR [ ] CLAIMS MADE<br>[ ] DEDUCTIBLE<br>[X] RETENTION   $10,000 | M00538942 | 12/15/2009 | 12/15/2010 | EACH OCCURRENCE | $25,000,000 |
| | | | | | | AGGREGATE | $25,000,000 |
| C | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**     Y/N<br>ANY PROPRIETOR / PARTNER / EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under SPECIAL PROVISIONS below | TC2HUB1761B37309 | 12/15/2009 | 12/15/2010 | [X] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | E.L. DISEASE-EA EMPLOYEE | $1,000,000 |
| | | | | | | E.L. DISEASE-POLICY LIMIT | $1,000,000 |
| B | | **OTHER**<br>E&O-ProfLiabPri | EONG21674643006 | 12/15/2009 | 12/15/2010 | Per Claim/Aggregate | $10,000,000 |
| | | | | | | SIR/Deductible | $1,000,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Rust Consulting Inc.<br>625 Marquette Avenue Suite 880<br>Minneapolis MN 55402 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE    *Aon Risk Services Northeast Inc* |

ACORD 25 (2009/01)

©1988-2009 ACORD CORPORATION. All rights reserved<br>The ACORD name and logo are registered marks of ACORD

Ex. 1
23

**INSURED**

SOURCECORP, Incorporated
Rust Consulting, Inc.
625 Marquette Avenue Suite 880
Minneapolis MN 55402 USA

Additional Coverage

Insurer: Underwriters At Lloyds

Policy Number:QK0902900

Policy Effective Date: 12/15/09

Policy Expiration Date: 12/15/10

Coverage: Excess Liability

Limits:  $10,000,000 Each Occurrence

Insurer: Steadfast Insurance Co

Policy Number: EOC654152600

Policy Effective Date: 12/15/09

Policy Expiration Date: 12/15/10

Coverage: Excess Liability

Limits:  $10,000,000 Each Occurrence

Certificate No :            570037183569

**Ex. 1**
24

# ATTACHMENT C

RUST
CONSULTING

## TERMS AND CONDITIONS

All claims administration services to be provided by Rust Consulting to Customer shall be subject to the following terms and conditions:

1. **Services.** Subject to the terms hereof, Rust Consulting agrees to provide Customer with claims administration services (hereinafter, "Claims Services") as specified in the Proposal provided to the Customer to which these Terms and Conditions are attached.

2. **Term.** This Agreement will remain in effect until completion of the Claims Services, unless earlier terminated in accordance with Section 10 hereof.

3. **Charges for Services.** Charges for Claims Services shall be on a time and materials basis at our prevailing rates, as the same may change from time to time. Any fee estimates set forth in the Proposal are estimates only, based on information provided by the Customer to Rust Consulting. Actual fees charged by Rust Consulting in connection with the Claims Services may be greater or less than such estimate. Rust Consulting shall be reimbursed from the Settlement Fund (as defined below) for all charges and out-of-pocket expenses incurred by Rust Consulting in connection with the Claims Services in accordance with Section 4 below. Payment of all state and local sales and use taxes, if any, levied upon the charges payable hereunder shall be made from the settlement fund. Rust Consulting may derive financial benefits from financial institutions in connection with the deposit and investment of settlement funds with such institutions, including without limitation, discounts on eligible banking services and fees, and loans at favorable rates.

4. **Payment of Charges.** Payments shall be made from the **settlement fund** established for the Settlement ("Settlement Fund"). Payments shall be made from the Settlement Fund within thirty (30) days of the date of invoice or, if court approval is required, within thirty (30) days after an order authorizing such payment has become final and no longer subject to appeal. Notwithstanding the foregoing, decisions of the court approving or disapproving the Settlement, including but not limited to withdrawal of the Settlement, do not affect Rust's right to payment for fees and expenses incurred hereunder. **Claims Services are not provided on a contingency fee basis.**

5. **Confidentiality.** Rust Consulting agrees to implement and maintain reasonable and appropriate security measures and safeguards to protect the security and confidentiality of Customer data provided to Rust Consulting by Customer in connection herewith. Should Rust Consulting ever be notified of any judicial order or other proceedings in which a third party seeks to obtain access to the confidential data created by or for the Customer, Rust Consulting will promptly notify the Customer, unless prohibited by applicable law. The Customer shall have the option to (1) provide legal representation at the Customer's expense to avoid such access or (2) promptly reimburse Rust Consulting for any of its costs, including attorneys' fees, reasonably incurred in avoiding, attempting to avoid or providing such access and not paid by the entity seeking the data. If Rust Consulting is required, pursuant to a court order, to produce documents, disclose data, or otherwise act in contravention of the obligations imposed by this Agreement, or otherwise, with respect to maintaining the confidentiality, proprietary nature and secrecy of the produced documents or disclosed data, Rust Consulting will not be liable for breach of said obligation.

6. **Standard Banking Procedures.** In accordance with Rust Consulting's standard banking procedures, Rust Consulting will establish a demand deposit checking account (i.e. non-interest bearing) for funds received related to a distribution, unless directed otherwise in writing by the parties or unless the settlement agreement stipulates otherwise. When directed to invest funds in an interest bearing or investment accounts, Rust Consulting intends to invest all funds in U.S. government backed securities, unless directed by the parties in writing or the settlement agreement or distribution plan to invest in other types of securities; however, even in cases where funds are temporarily placed in interest bearing or investment accounts, funds will eventually be migrated to a demand deposit checking account prior to a fund distribution.

7. **Rights in Data.** Rust Consulting does not convey nor does the Customer or any third party obtain any right in the programs, system data, or materials utilized or provided by Rust Consulting in the ordinary course of business in the performance of this Agreement.

8. **Document Retention.** Unless directed otherwise in writing by Customer, Rust Consulting will destroy undeliverable notice mail on the effective date of the settlement or the date that the disposition of the case is no longer subject to appeal

or review, whichever is later. Rust will maintain claim forms and other correspondence for one year after final distribution of funds or benefits or until the date that the disposition of the case is no longer subject to appeal or review, whichever is later. Rust Consulting will retain all bank and tax documents for such period of time as it determines is required to maintain compliance with various federal and state requirements.

9. **Limitation of Liability: Disclaimer of Warranty.** Rust Consulting warrants that our services will be performed with reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty. Rust Consulting shall not be liable, whether under theories of contract, negligence or other tort, statutory duty or other theories of liability in an amount exceeding the total charges to the Settlement Fund for the specific work affected by the error or omission. Rust Consulting will not be liable for any incidental, special, indirect, consequential, or exemplary damages of any kind, or for any lost profits, lost opportunities, or business interruption or for any liability incurred by the Customer or others to any third party. THE WARRANTIES SET FORTH HEREIN ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE FOR PARTICULAR PURPOSE.

10. **Termination.** The Claims Services to be provided under this Agreement may be terminated, at will by the Customer upon at least thirty (30) calendar days' prior written notice to Rust Consulting. The obligation of the Settlement Fund to pay for services or projects in progress at the time of notice of withdrawal shall continue throughout that thirty (30) day period. Rust Consulting may terminate this Agreement (i) with ten (10) calendar days' prior written notice, if payment of charges hereunder is not approved or timely made, or (ii) in any event, upon at least three (3) months' prior written notice to the Customer.

11. **Notice.** Any notice required or permitted hereunder shall be in writing and shall be delivered personally, by, or sent by registered mail, postage prepaid, or overnight courier service to the responsible officer or principal of Rust Consulting or the Customer, as applicable, and shall be deemed given when so delivered personally, or, if mailed, five days after the date of deposit in United States mail, or, if sent by courier, one business day after delivery to such courier service.

12. **Force Majeure.** To the extent performance by Rust Consulting of any of its obligations hereunder is substantially prevented by reason of any act of God or by reason of any other matter beyond Rust Consulting's reasonable control, then such performance will be excused and this Agreement, at Rust Consulting's option, be deemed suspended during the continuation of such condition and for a reasonable time thereafter.

13. **Nonwaiver of Rights.** No failure or delay on the part of a party in exercising any right hereunder will operate as a waiver of, or impair, any such right. No single or partial exercise of any such right will preclude any other or further exercise thereof or the exercise of any other right. No waiver of any such right will be effective unless given in a signed writing.

14. **Jurisdiction.** The parties hereto irrevocably and unconditionally submit to the jurisdiction of the Court of the applicable case for purposes of any suit, action or proceeding to enforce any provision of, or based on any right arising out of, this Agreement. The parties hereto hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding in the Court.

15. **Survival.** All accrued payment obligations hereunder, any remedies for breach of this Agreement, this Section and the following Sections will survive any expiration or termination of this Agreement: Section 5 (Confidentiality); Section 7 (Rights in Data), Section 8 (Document Retention); Section 9 (Limitation of Liability, Disclaimer of Warranty), Section 13 (Nonwaiver of Rights), and Section 14 (Jurisdiction).

16. **Entire Agreement.** These Terms and Conditions and the proposal embody the entire agreement between the parties with respect to the subject matter hereof, and cancels and supersedes all prior negotiations, representations, and agreements related thereto, either written or oral, except to the extent they are expressly incorporated herein. No changes in, additions to, or waivers of the terms and conditions set forth herein will be binding upon any party, unless approved in writing by such party's authorized representative.

Ex. 1
26